AO 106 (Rev. 06/09)    Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

IN THE MATTER OF THE SEARCH OF THE )    Case No. 4:25 MJ 3285 NCC
PREMISES LOCATED AT: **4038 SULLIVAN** )    *Signed and Submitted to the Court for*
**AVENUE, 1ˢᵗ FLOOR, ST. LOUIS AVENUE, ST.** )    *filing by reliable electronic means*
**LOUIS, MO 63107, TARGET PREMISES #2,** )    **FILED UNDER SEAL**
MORE FULLY DESCRIBED IN ATTACHMENT )
B

## APPLICATION FOR A SEARCH WARRANT

I,   __William A. Meyers__ , a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

**4038 SULLIVAN AVENUE, 1ˢᵗ FLOOR, ST. LOUIS AVENUE, ST. LOUIS, MO 63107, TARGET PREMISES #2,** MORE FULLY DESCRIBED IN ATTACHMENT B

located in the   _____**EASTERN**_____   District of   _____**MISSOURI**_____  , there is now concealed

**See Attachment E**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
    ✓ evidence of a crime;
    ✓ contraband, fruits of crime, or other items illegally possessed;
    ✓ property designed for use, intended for use, or used in committing a crime;
    ☐ a person to be arrested

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, USC Section 841(a)(1), 846 | Distribution & conspiracy to distribute controlled substances |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

    ✓    Continued on the attached sheet.
    ☐    Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*
William A. Meyers Special Agent FBI

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedures 4.1 and 41

Date:     _____September 23, 2025_____      _____
*Judge's signature*

City and State:     _____St. Louis, MO_____      _____Honorable Noelle C. Collins. U.S. Magistrate Judge_____
*Printed name and title*
AUSA: Ricardo Dixon

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANT

I, William A. Meyers, being first duly sworn by reliable electronic means, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as **1730 DORIS WALTER LANE, ST. CHARLES, MO 63303** (hereinafter "**Target Premises #1**"), further described in Attachment A; **4038 SULLIVAN AVENUE, 1st FLOOR, ST. LOUIS AVENUE, ST. LOUIS, MO 63107** (hereinafter "**Target Premises #2**"), further described in Attachment B**; 4000 ST. LOUIS AVENUE, 1st FLOOR, ST. LOUIS, MO 63107** (hereinafter "**Target Premises #3**"); **1213 GREGAN PLACE, ST. LOUIS, MO, 63133** (hereinafter referred to as "**Target Premises #4**") further described in Attachment D, all for the things described in Attachment E.

2.       I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice.  I have been employed with the FBI since September 2007 and am currently assigned to the St. Louis Gateway Strike Force.  Prior to my employment with the FBI, I was a Police Officer for the City of Downers Grove (Illinois) for six (6) years. In connection with my official FBI duties, I investigate criminal violations of the Controlled Substances Act.  I have received specialized training in the enforcement of federal narcotics laws, and I have been involved in all aspects of narcotics trafficking investigations, including (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from drug trafficking; (b) surveillance; and (c) analysis of documentary and physical evidence.  I have also received training and participated in investigations involving the interception of both wire

communications and electronic communications involving digital display paging devices.  Finally, I have testified in grand jury proceedings for violations of federal narcotics laws.  Based on my training and experience as an FBI Special Agent, I am familiar with the ways in which narcotics dealers conduct their drug-related business, including, but not limited to, their methods of importing and distributing narcotics; their use of telephones and digital display paging devices, and their use of numerical codes and code words to identify themselves, the nature of the communication and/or to conduct their transactions; and their concealment of drug proceeds in real and personal property as well as legitimate businesses.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 846 (hereinafter the "subject offenses") have been committed by **Charles CULTON** (hereinafter "**CULTON**"), or other persons known and unknown.  There is also probable cause to search the information described in Attachments A, B, C, and D for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment E.

### LOCATIONS TO BE SEARCHED

5.      The four locations to be searched are:

a.      The residence, known and numbered **1730 DORIS WALTER LANE, ST. CHARLES, MO 63303**, hereinafter referred to as **Target Premises #1**. **Target Premises #1** is a single-family, two-story home, with the front of the residence facing Doris Walter

2

Lane. It is comprised of brown brick, with beige vinyl siding and white colored trim and a gray front door. The roof of **Target Premises #1** is covered with dark colored asphalt shingles. A two- car garage, with a white garage door is attached to the residence. The numbers "1730" are affixed horizontally to the left of the front door. **Target Premises #1** is situated on the south side of Doris Walter Lane, west of Graystone Drive. **Target Premises #1** is in St. Charles, Missouri, within the Eastern District of Missouri. A photograph of **Target Premises #1** appears in Attachment A.

b.        The residence, known and numbered **4038 SULLIVAN AVENUE, 1ˢᵗ FLOOR, ST. LOUIS AVENUE, ST. LOUIS, MO 63107,** hereinafter referred to as **Target Premises #2**. **Target Premises #2** is a two-unit, residential apartment building comprised of a brown brick exterior and white window frames. The covered front porch with concrete steps, leads up to the front doors for the separate apartment units. The front door to **Target Premises #2** is the left door, when facing the front of **Target Premises #2** from Sullivan Avenue. The right door is for a separate unit that leads upstairs. The right door does not lead to **Target Premises #2**. The front of the apartment building faces Sullivan Avenue. **Target Premises #2** is situated on the south side of Sullivan Avenue, three (3) houses east of Clay Avenue. **Target Premises #2** is in St. Louis, Missouri, within the Eastern District of Missouri. Investigators are requesting the search warrant for the first-floor apartment unit only and not the second floor unit. A photograph of **Target Premises #2** appears in Attachment B.

c.        The residence, known and numbered **4000 ST. LOUIS AVENUE, 1ˢᵀ FLOOR, ST. LOUIS, MO 63107,** hereinafter referred to as **Target Premises #3**. **Target Premises #3** is a two-unit, residential apartment building comprised of a red brick exterior

3

and white window frames. The covered front porch with concrete steps, leads up to the front doors for the separate apartment units. The front door to **Target Premises #3** is the left door, when facing the front of **Target Premises #3** from St. Louis Avenue. The right door is for a separate unit that leads upstairs. The right door does not lead to **Target Premises #3**.  The front of the apartment building faces St. Louis Avenue. The numbers "4000" are affixed horizontally above the front doors to the apartments. **Target Premises #3** is situated on the northwest corner of St. Louis Avenue and Bishop L. Scott Avenue. **Target Premises #3** is in St. Louis, Missouri, within the Eastern District of Missouri . Investigators are requesting the search warrant for the first-floor apartment unit only and not the second floor unit. A photograph of **Target Premises #3** appears in Attachment C.

d.     The residence, known and numbered **1213 GREGAN PLACE, ST. LOUIS, MO, 63133**, hereinafter referred to as **Target Premises #4**. **Target Premises #4** is a single-family, one-story home, with the front of the residence facing Gregan Place, is comprised of a red brick, with white colored trim around the windows and front door. The roof of **Target Premises #4** is covered with dark colored asphalt shingles. The numbers "1213" are affixed horizontally to the left of the front door. **Target Premises #4** is situated on the west side of Gregan Place, south of Page Avenue. **Target Premises #4** is in St. Louis, Missouri, within the Eastern District of Missouri. A photograph of **Target Premises #4** appears in Attachment D.

## INVESTIGATION AND PROBABLE CAUSE

**A.     Background of Investigation**

6.     The United States, including the FBI, is conducting a criminal investigation of **CULTON**, aka "Wop," (hereinafter "**CULTON**") regarding the commission of the subject

4

offenses.

7.      The United States, including the FBI, began conducting a criminal investigation of **CULTON** in June 2025.  FBI received information from a Confidential Informant (CI)[1] during an initial debrief. The CI stated that "Wop," who was later identified as **CULTON**, was distributing narcotics.   The CI also stated that he/she contacted "Wop" at (314) 641-9049 (hereinafter the "**CULTON cellular telephone**") to arrange to buy narcotics.[2] Investigators showed a photograph of **CULTON** to the CI, who positively identified **CULTON** as "Wop."

8.      Between June 2025, and September 2025, members of the Investigative Team utilized the CI to conduct six (6) controlled purchases of suspected narcotics from **CULTON** by contacting the **CULTON cellular telephone**. The controlled purchases are described generally in the following paragraphs, with more specific detail provided for certain controlled purchases. As discussed below, the investigation has revealed that **CULTON** is engaged in the commission of the subject offenses and is utilizing the aforementioned **target residences** to further his drug trafficking operation.

**B.      Week of June 30, 2025 – Controlled Purchase #1**

9.      During the week of June 30, 2025, members of the investigative team, utilized the CI to conduct a controlled purchase of fentanyl from **CULTON**.

---

[1] This CI has provided accurate and reliable information to law enforcement officer about **CULTON** and others.  Information provided about **CULTON** was verified through background checks, controlled purchases, and surveillance operations.  None of the information provided by the CI has been false or misleading.  This CI is currently working with law enforcement in return for monetary compensation.

[2] The subscriber information for the **CULTON cellular telephone** came back "Big Money." Based upon prior training and experience of your affiant, it is common for drug traffickers to use cell phones subscribed to different names to avoid law enforcement detection.

10.    The CI contacted **CULTON** at the **CULTON cellular telephone** and asked to buy $6,500 worth of fentanyl.  **CULTON** agreed and directed the CI to meet near Page Avenue and Pennsylvania Avenue in St. Louis. Surveillance observed **CULTON** walk out of No Sauce BBQ, 7006 Page Avenue, St. Louis, a restaurant owned and operated by **CULTON**. **CULTON** got into the driver's seat of a white Chrysler Pacifica with Florida plate LDUS11[3] and departed the area. The CI was then given approximately $6,500 in buy money and was outfitted with an audio transmitter and recorder to allow investigators to hear and record the anticipated controlled purchase.

11.    The CI, being followed by surveillance, traveled to the area of Page Avenue and Pennsylvania Avenue and waited for **CULTON** to arrive. Other members of the surveillance team had kept a visual of **CULTON** and the aforementioned white Chrysler Pacifica after it left the No Sauce BBQ. **CULTON** proceeded to contact the CI and re-directed the CI to the parking lot of a commercial business on Natural Bridge Road and Newstead Avenue in St. Louis.  A portion of surveillance traveled to the area of Natural Bridge Road and Newstead Avenue. Investigators temporarily lost sight of the Pacifica before observing the white Chrysler Pacifica with the same Florida license plate, arrive at **Target Premises #2**. As investigators were establishing surveillance at **Target Premises #2**, the Pacifica departed. Investigators observed the Pacifica arrive to the lot of the commercial business. A blue Audi Sport Utility Vehicle (SUV), with unknown temporary license plate, followed the Pacifica into the parking lot. The driver from the Audi, whose identity

---

[3] Florida registration plate LDUS11 was queried through law enforcement databases which identified the vehicle being registered to Hertz Rental Cars, on a 2025 Chrysler Pacifica. Records provided, via subpoena, from Hertz, identified the Pacifica being rented to Delicia Walker. Based upon prior training and experience of your affiant, it is common for drug traffickers to rent vehicles under different names to avoid law enforcement detection.

6

is known to investigators, got into the front passenger's seat of the Pacifica. The Pacifica remained parked, and did not leave the commercial business lot.

12.    The CI arrived at the same, commercial business lot on Natural Bridge Road and Newstead Avenue, as directed by **CULTON**. When the CI arrived, the CI parked his/her vehicle near the Pacifica. The CI got into the Pacifica and conducted a hand-to-hand transaction with **CULTON**. The CI provided cash to **CULTON** in exchange for a white chunky substance, later confirmed to be fentanyl. Investigators confirmed with the CS that the person they conducted the hand-to-hand transaction with was in fact CULTON. This was corroborated by investigators after reviewing the audio/video recording which captured the transaction.

13.    Laboratory analysis of the substance distributed by **CULTON** revealed the presence of fentanyl with an approximate weight of 142.38 grams.

14.    Global Positioning Satellite (GPS) records provided by the Hertz Rental Company, via subpoena, confirmed that during controlled purchase #1, after **CULTON** received the call from the CI arranging the transaction, the Pacifica, being driven by **CULTON**, departed No Sauce BBQ (7006 Page Avenue) and drove directly to the **Target Premises #2**[4], where it remained for approximately 20 minutes, before traveling directly to the meeting location near Natural Bridge Avenue and Harris Avenue, where the CI conducted the controlled purchase of fentanyl from **CULTON**. It's worth noting that the Pacifica's GPS data pings occurred approximately every 20 seconds, allowing investigators to clearly view the Pacifica's location every 20 seconds, as it traveled from No Sauce BBQ, directly to **Target Premises** #2, then to the meet location where **CULTON** conducted the transaction with the CI.

---

[4] Local electric utility records identified active service at the **Target Premises #2** listed under "Charles **CULTON**".

15.     Based on the surveillance team observing **CULTON** as he departed No Sauce Restaurant immediately after the CI placed the call to arrange the transaction with him, and surveillance observing **CULTON** being the only person in the Pacifica as it traveled from No Sauce directly to **Target Premises #2**, then being the only individual in the Pacifica as it traveled directly to the meet location with the CI, coupled with vehicle GPS corroborating these details, investigators believe that **CULTON** obtained the narcotics from **Target Premises #2** before going to distribute them to the CI. Further, **Target Premises #2** is owned by **CULTON** with active utilities at the residence. Additionally, surveillance which was later conducted by investigators at **Target Premises #2**, revealed that not only is no one residing at **Target Premises #2**, but that **CULTON** has unusual, sporadic visits at **Target Premises #2,** with infrequent and short durations, indicative of additional evidence to support **CULTON'S** use of **Target Premises #2** to distribute narcotics. Your affiant is aware that individuals engaged in drug trafficking activity often store bulk narcotics in their residence and stash houses, and do not travel with all of their supply to individual drug transactions.

### C.  July 10, 2025 – Initial PLW

16.     On July 10, 2025, the Honorable Magistrate Judge Stephen R. Welby signed a warrant authorizing the monitoring of precision location information (hereinafter the "PLW") on the **CULTON cellular telephone**.

### D.  PLW Records Review

17.     A review of Ping and cell tower location data from the PLW between June 2025 and September 2025, identified the **CULTON cellular telephone** is consistently located in the immediate vicinity of the **Target Premises #1,** during overnight hours. Public utility records for **Target Premises #1** identified an active electric service account connected to the **CULTON**

8

**cellular telephone.** The address listed on the account is the **Target Premises #1**. The account is listed under another individual's name, whose identity is known to investigators. Service has been active since November 2024.  Based on prior training and experience of your affiant, the consistent location of **CULTON'S** phone during overnight hours demonstrates that the **Target Premises #1** is **CULTON'S** residence. [5] Furthermore, based on prior training and experience, your affiant is aware that drug traffickers who utilized multiple residences while engaging in drug trafficking activity will store portions of their drug proceeds or narcotics at their main residence.

      **E.**      **Week of July 13, 2025 – Controlled Purchase #2**

18**.**      During the week of July 13, 2025, members of the investigative team, utilized the CI to conduct a controlled purchase of crack-cocaine from **CULTON**.

19.      The CI contacted **CULTON** at the **CULTON cellular telephone** and asked to buy crack-cocaine.  **CULTON** agreed and directed the CI a parking lot of a commercial business near Union Boulevard and Page Avenue in St. Louis.  Prior to the operation taking place, ping and cell tower location data from the PLW, identified the **CULTON cellular telephone** was in the immediate vicinity of **Target Premises #1**.

20.      A portion of the investigative team established surveillance at **Target Premises #1**. A blue Chevrolet Tahoe, with Missouri plate EM5P9G[6], was parked on the driveway in front of

---

[5] Based upon prior training and experience of your affiant, it is common for drug traffickers to store communication devices, such as cell phones, used for drug transactions, while also storing drug ledgers, and proceeds from their drug sales where they reside, to ensure items of high value and importance are in their possession for safekeeping. It is also common for drug traffickers to use multiple locations to store and distribute their narcotics.

[6] Missouri registration plate EM5P9G was queried through law enforcement databases which identified the vehicle being registered to Hertz Rental Cars, on a 2025 Chevrolet Tahoe. Records provided, via subpoena, from Hertz, identified the Tahoe being rented to Shahron Vaulx. Based

the **Target Premises #1**. Prior to the operation, members of the surveillance team were provided a photograph of CULTON. Investigators conducting surveillance in close proximity to **Target Premises #1**, and observed **CULTON** walk out of **Target Premises #1** and get into the driver's seat of the Tahoe. The Tahoe departed the area, being followed by surveillance. **CULTON** drove to the 5300 block of Theodosia Avenue in St. Louis, where **CULTON** parked his vehicle momentarily, before departing the area again. Surveillance did not observe **CULTON** exit the Tahoe, and did not observe anyone approach the vehicle.[7]

21.    The CI was then given approximately $8,000 in buy money and was outfitted with an audio transmitter and recorder to allow investigators to hear and record the anticipated controlled purchase. The CI, being followed by a portion of the surveillance team, drove to the lot dictated by **CULTON**. **CULTON** called the CI from the **CULTON cellular telephone**, to let the CI know that he was on the way and would arrive soon. Thereafter, the surveillance team observed the Tahoe arrive in the lot of near Union and Page.

22.    The CI, who was already present on the lot, waited for **CULTON** to arrive. After **CULTON** arrived, the CI got into the **CULTON'S** vehicle and conducted a hand-to-hand transaction with **CULTON**. The CI provided cash to **CULTON** in exchange for a white chunky substance, later confirmed to be cocaine-base. Investigators confirmed with the CI that the person they conducted the hand-to-hand transaction with was in fact **CULTON**. This was corroborated

---

upon prior training and experience of your affiant, it is common for drug traffickers to rent vehicles under different names to avoid law enforcement detection.

[7] Based upon prior training and experience of the investigative team, **CULTON'S** actions of stopping momentarily on a dead-end street before continuing is consistent with surveillance detection routes (SDR), a common tactic used by drug traffickers to identify surveillance and avoid law enforcement detection.

by investigators after reviewing the audio/video recording which captured the transaction.

23.     Ping and cell tower location data from the PLW was consistent with the location and timeframe that surveillance observed **CULTON**, as he traveled from the **Target Premises #1** to the meet location, indicating **CULTON** was in possession of his phone both inside the **Target Premises #1** and as he traveled to the meet location for the narcotics transaction.

24.     Based on the surveillance team observing **CULTON** leave **Target Premises #1** immediately prior to the controlled purchase, investigators believe that **CULTON** obtained the narcotics from **Target Premises #1** before going to distribute them to the CI. Your affiant is aware that individuals engaged in drug trafficking activity often store bulk narcotics in their residence, and stash houses, and do not travel with all of their supply to individual drug transactions.

25.     Laboratory analysis of the substance revealed the presence of cocaine base, with an approximate weight of 258.06 grams.

**F.  Week of August 3, 2025 – Controlled Purchase #3**

26.     During the week of August 3, 2025, members of the investigative team utilized the CI to conduct another controlled purchase of fentanyl from **CULTON**.

27.     Prior to the operation taking place, ping and cell tower location data from the PLW, identified the **CULTON cellular telephone** was in the immediate vicinity of **Target Premises #1**. A portion of the investigative team met the CI at staging location while other investigators established surveillance at the **Target Premises #1**. A gray Nissan Pathfinder, with Missouri license plate CA8S6Y[8], was parked on the driveway at **Target Premises #1.**

---

[8] Missouri registration plate CA8S6Y was queried through law enforcement databases which identified the vehicle being registered to Hertz Rental Cars, on a 2025 Nissan Pathfinder. Records provided, via subpoena, from Hertz, identified the Pathfinder being rented to Shahron Vaulx.

28. The CI contacted **CULTON** at the **CULTON cellular telephone** however, the CI did not receive a response. It should be noted that around this time, pings sent to the **CULTON cellular telephone** failed to locate the device's location, indicating the phone was either turned off, or was not actively connected to a cell tower. The CI then contacted another phone number, (314) 629-8119, which **CULTON** previously provided to the CI. **CULTON** responded by telling the CI that he tried calling the CI (from the **CULTON cellular telephone),** but no one answered. The CI asked to buy fentanyl. **CULTON** agreed and directed the CI call him when the CI was ready to meet.

29. While in the presence of investigators, the CI called **CULTON** at telephone number (314) 629-8119. The CI placed their phone in speaker mode to allow investigators to hear the call. Based on prior interactions with **CULTON**, your affiant recognized the voice on the phone to be **CULTON**. The CI informed **CULTON** he/she was ready to meet. **CULTON** directed the CI to the parking lot of a commercial business on Natural Bridge Road and Newstead Avenue in St. Louis.

30. The CI was then given approximately $6,500 in buy money and outfitted with an audio transmitter and recorder to allow investigators to hear and record the anticipated controlled purchase. The CI, being followed by surveillance, drove to the lot directed by **CULTON.**

31. Prior to the operation, members of the surveillance team were provided a photograph of **CULTON**. Investigators conducting surveillance in close proximity to **Target Premises #1**, observed **CULTON** walk out of **Target Premises #1** and get into the driver's seat of the Pathfinder. The Pathfinder departed the area, being followed by surveillance. **CULTON**

12

arrived at the **Target Premises #3**[9] and walked inside. A few minutes later, **CULTON** walked out of the **Target Premises #3** and got into the driver's seat of the Pathfinder. The Pathfinder departed the area, being followed by surveillance.

32.     **CULTON** arrived at the deal location dictated by **CULTON**.  The CI got into **CULTON'S** vehicle. The CI provided cash to **CULTON** in exchange for a white chunky substance, later confirmed to be fentanyl. Investigators confirmed with the CI that the person they conducted the hand-to-hand transaction with was in fact **CULTON**. This was corroborated by investigators after reviewing the audio/video recording which captured the transaction.

33.      Laboratory analysis of the substance revealed the presence of fentanyl with an approximate weight of 231.99 grams.

34.     Ping and cell tower location data from the PLW was consistent with the location and timeframe that surveillance observed **CULTON**, as he traveled from the **Target Premises #1** to **Target Premises #3,** and then to the meet location, indicating **CULTON** was in possession of his phone both inside the **Target Premises #1, Target Premises #3,** and as he traveled to the meet location for the narcotics transaction with the CI.

35.     Based on **CULTON's** travel path from **Target Premises #1** to **Target Premises #3** immediately before the drug transaction, investigators believe that **CULTON** obtained the narcotics from **Target Premises #3** before going to distribute them to the CI.  Your affiant is aware that individuals engaged in drug trafficking activity often store bulk narcotics in their residence,

---

[9] Public utility account records revealed active utility service at **Target Premises #3**, under the name, Lamar CALDWELL. CALDWELL has prior arrests for unlawful use of a weapon and resisting arrest. Public utility account records for the second-floor apartment are listed under the name, Tyrone CALDWELL. Investigators are requesting the search warrant for the first-floor apartment only.

and stash houses, and do not travel with all of their supply to individual drug transactions.

**G. Week of August 17, 2025 – Controlled Purchase #4**

36.    During the week of August 17, 2025, members of the investigative team  utilized the CI to conduct another controlled purchase of suspected fentanyl from **CULTON**.

37.    Prior to the operation taking place, PLW data identified **CULTON'S** cell phone location to be in the immediate vicinity of the **Target Premises #1**.  The next ping identified **CULTON'S** cell phone to be in the immediate vicinity of I-70 and Missouri 370, in St. Peters, Missouri. Investigators met the CI, who advised that he/she was previously contacted by **CULTON** at the **CULTON cellular telephone. CULTON** informed the CI that he (**CULTON**) was ready to meet whenever the CI was ready. The CI told **CULTON** he/she would call him back soon.  Several minutes later, the CI contacted the **CULTON cellular telephone** and informed **CULTON** he/she was ready to meet and wanted fentanyl. **CULTON** directed the CI to meet in the same lot on Natural Bridge Road near Newsted Avenue (the same location as the first and third controlled purchases). The CI was outfitted with approximately $6,500 in buy money and was outfitted with an audio transmitter and recorder to allow investigators to hear and record the anticipated controlled purchase. Investigators followed the CI to the meet location as dictated by **CULTON**.

38.    Based upon surveillance observing **CULTON** departing **Target Premises #3** immediately before **CULTON** conducted controlled purchase #3, investigators established surveillance at **Target Premises #3**. After the CI placed the call to **CULTON**, to arrange the transaction, a light blue Audi SUV (the same Audi observed during the first controlled purchase),

14

arrived at the **Target Premises #3**. Anthony STRINGER[10] walked out of the **Target Premises #3**, and greeted **CULTON** and the driver of the Audi, whose identity is known to investigators (the same individual who was present during controlled purchase #1). All three individuals then walked into **Target Premises #3.**

39.     **CULTON**, the Audi driver, and STRINGER were observed by investigators walking out the **Target Premises #3.** STRINGER walked back into the building as **CULTON** got into the front passenger's seat of the Audi and the other individual got into the driver's seat. The Audi departed and traveled to the same commercial business lot dictated by **CULTON**, parking near the CI's vehicle. The CI exited their car and got into the Audi and exchanged the cash for a chalky, white substance, confirmed to be fentanyl.   Investigators confirmed with the CI that the person they conducted the hand-to-hand transaction with was in fact **CULTON**. This was corroborated by investigators after reviewing the audio/video recording which captured the transaction.

---

[10] Based upon prior investigations into **CULTON'S** drug trafficking organization (DTO) in 2021, investigators were aware of Anthony STRINGER'S role in **CULTON'S** DTO, as someone **CULTON** used to hold a portion of **CULTON'S** narcotics. STRINGER was the only person present during the execution of a previous search warrant which resulted in significant quantities of methamphetamine, cocaine and fentanyl, being seized. The execution of the search warrant was at another location and was not the **Target Premises #3**. During that investigation, STRINGER admitted that **CULTON** was using his apartment to store the narcotics. Further, during a controlled drug purchase in that investigation, STRINGER was present when the CI (a separate CI from the one used in this investigation) arrived at the meet location to conduct the transaction. The CI provided the U.S. currency to STRINGER, and **CULTON** provided the narcotics to the CI. STRINGER has prior arrests for possession of a controlled substance and distribution of a controlled substance. Investigators have observed STRINGER at the **Target Premises #3** on multiple occasions. Investigators believe STRINGER resides at the **Target Premises #3**, at least a portion of the time, as STRINGER has no active public utilities listed in his name, and STRINGER has not been observed by investigators at other locations.

40.    Based on the surveillance team observing **CULTON** leaving **Target Premises #3** immediately prior to the controlled purchase, investigators believe that **CULTON** obtained the narcotics from **Target Premises #3** before going to distribute them to the CI. Your affiant is aware that individuals engaged in drug trafficking activity often store bulk narcotics in their residence, and stash houses, and do not travel with all of their supply to individual drug transactions.

41.    Ping and cell tower location data from the PLW was consistent with the location and timeframe that surveillance observed **CULTON**, as he traveled from the **Target Premises #3** to the meet location, indicating **CULTON** was in possession of his phone both inside the **Target Premises #3** and as he traveled to the meet location for the narcotics transaction.

42.    Laboratory analysis of the substance revealed the presence of fentanyl with an approximate weight of 236.83 grams.

### H.  Surveillance at the Target Premises #2

43.    Surveillance conducted on the **Target Premises #2** revealed suspected hand-to-hand drug transactions involving the **Target Premises #2.** During the transactions **CULTON** was always present and walked out of the **Target Premises #2** to complete the transactions.  Only a portion of those transactions are detailed in this affidavit.

44.    On August 26, 2025, during the afternoon hours, investigators conducted surveillance on **CULTON**. The PLW data identified the **CULTON cellular telephone** to be in the immediate vicinity of the **Target Premises #2.** Investigators observed and positively identified **CULTON** arrive in a Nissan Pathfinder (the same vehicle he drove during the third, fourth, and fifth drug transactions). A black Mercedes-Benz sedan arrived at the same time. **CULTON** got out of the Pathfinder, an individual identified as Corey Culton, **CULTON'S** brother, got out of the driver's seat of the Mercedes.  **CULTON** carried a bag, a medium-sized cardboard box, and

16

another unknown item into the **Target Premises #2**. A few minutes later, **CULTON** exited the **Target Premises #2** with nothing in his hands. Both drivers then switched their vehicles, **CULTON** departed in the Mercedes and Corey Culton departed in the Pathfinder.

45.    In the evening on August 26, 2025, additional surveillance was conducted outside the **Target Premises #2**. The PLW data identified the **CULTON cellular telephone** to be in the immediate vicinity of the **Target Premises #2. CULTON** and another, unknown black male arrived and walked into the **Target Premises #2**. **CULTON** and the unknown male exited the **Target Premises #2** about one (1) minute later.

46.    On August 27, 2025, investigators conducted surveillance of **CULTON**. At approximately 9:45 am, the PLW data identified the **CULTON cellular telephone** to be in the immediate vicinity of the **Target Premises #2**.   A white van arrived and parked on the street in front the **Target Premises #2**. The word, "Big Adventures Academy"[11] and telephone number (314) 261-4446 were on the side of the van,

47.    The driver of the van remained in the vehicle.  Approximately 10 minutes later, the driver of the van, an unknown black male, wearing a green shirt and dark pants, got out and walked to the rear of the van. **CULTON** arrived in the same gray Nissan Pathfinder. **CULTON**, who had nothing in his hands, walked into the **Target Premises #2**. The driver of the van remained at the rear of the van.

48.    A few minutes later, **CULTON** exited the **Target Premises #2**. As **CULTON** exited the residence, he was now carrying a white, brick-shaped item in his left hand. **CULTON** approached the rear of the van. Investigators noted that color and shape of the item in C**ULTON'S**

---

[11] A Google search of Big Adventures Academy revealed it's a child daycare located at 5485 Union Boulevard, St. Louis.

hand, matched the same color and shape of the fentanyl provided to the CI during the fourth and fifth drug transactions. A few seconds after **CULTON** approached the driver at the rear of the van, the driver got into the driver's seat of the van and departed. **CULTON** departed immediately after in the Nissan Pathfinder.

49.    Based on investigators prior knowledge that no one lives at **Target Premises #2**, and the surveillance team observing **CULTON** entering **Target Premises #2** with nothing, before exiting just a few minutes later with a white, brick-shaped item in his left hand (similar to what the CI was provided during prior controlled purchases), and **CULTON** having unusual, sporadic visits at **Target Premises #2,** with infrequent and short durations, are all indicative of additional evidence to support **CULTON'S** use of **Target Premises #2** to distribute narcotics. Your affiant is aware that individuals engaged in drug trafficking activity often store bulk narcotics in their residence and stash houses, and do not travel with all of their supply to individual drug transactions.

50.    Additional surveillance of **CULTON** was conducted by investigators on August 29, 2025. At approximately 9:20 am, the PLW data identified the **CULTON cellular telephone** to be in the immediate vicinity of the **Target Premises #2.** Surveillance observed **CULTON** walk into the **Target Premises #2** at approximately 9:18 am, with nothing in his hands. Approximately six (6) minutes later, **CULTON** exited the **Target Premises #2** carrying a plastic bag. Based on the shape of the bag, it appeared the bag contained a square shaped object and appeared to be similar in shape and size with the fentanyl the CI purchased from **CULTON**.  Based upon **CULTON** entering **Target Premises #2** with nothing in his hands, and being inside **Target Premises #2** for only six (6) minutes before exiting while carrying a bag containing the size and shape of the item inside the bag, being described as similar in shape and size of the fentanyl previously purchased by the CI, investigators believe **CULTON** retrieved fentanyl from **Target**

18

**Premises #2** to complete a drug transaction. The CI previously advised investigators that **CULTON** is surveillance conscious, and aware of law enforcement surveillance tactics. Due to investigators' intentions of conducting additional controlled purchases from **CULTON**, investigators did not follow **CULTON** away from the residence, as to avoid **CULTON** detecting law enforcement's presence.

51.    Extensive surveillance conducted at the **Target Premises #2** from August 22, 2025, to present, revealed the residence is not occupied. The only individuals observed during surveillance who accessed the **Target Premises #2** were **CULTON**, and his brother Corey.

Based on prior training an experience of your affiant, and other members of the investigation, the number of individuals (commonly referred to as "foot traffic") who meet **CULTON** at the **Target Premises #2**, coupled with the short duration of time in which individuals remain at the **Target Premises #2,** further show **CULTON** is using the **Target Premises #2** to store and distribute narcotics. Furthermore, based on **CULTON** previous involvement in observed distributions of illegal narcotics to the CI, investigators further believe that **Target Premises #2** is a place where **CULTON** stores narcotics or other drug contraband.

### I.  Surveillance at the Target Premises #3

52.    Surveillance conducted on the **Target Premises #3** revealed multiple suspected hand-to-hand drug transactions involving the **Target Premises #3.** During the transactions individuals typically approached the **Target Premises #3** on foot and contacted individuals inside the **Target Premises #3** by knocking on the first-floor east side window at the **Target Premises #3**. Based upon the layout of the building, first-floor apartment (the **Target Premises #3**) is accessible through the front door (the left door when facing the building from St. Louis Avenue), or the first-floor door on the east side of the building. Only a portion of those transactions are

19

detailed in this affidavit.

53.     On August 19, 2025, surveillance was conducted during the afternoon hours at the **Target Premises #3.** An unknown black male (UM #1), wearing a gray shirt with black pants, carrying what appeared to be a brown paper bag, walked east on St. Louis Avenue to Bishop L. Scott Avenue. UM #1 stood at the intersection of St. Louis Ave and Bishop L. Scott Ave, for several seconds before approaching the east side of the **Target Premises #3**. UM #1 knocked on the first-floor window on the east side of the **Target Premises #3**. The window is to the left of the door (the same door used by **CULTON** during controlled drug purchase #3 and #4). UM #1 stood under the window. UM #1 walked behind a nearby tree on the east side of the target residence.  A heavier-set black male (UM #2), wearing a red shirt, red baseball and blue jeans, and a black male, thin build, wearing a black shirt, dark pants, and light-colored hat, believe to be STRINGER, walked out of the **Target Premises #3** through the east side door and greeted UM #1. STRINGER walked north on Bishop L. Scott as UM #1 and UM #2 walked behind the same tree. UM #1 and UM #2 where conversing as they appeared to engage in a hand-to-hand transaction.

54.     UM #1 walked from behind the tree and began walking east, crossing Bishop L. Scott Avenue before turning to walk south on Bishop L. Scott. UM #2 walked around to the front of the target residence and walked inside the **Target Premises #3** through the front door.

55.     On August 31, 2025, surveillance conducted outside the **Target Premises #3** revealed what appeared to be a hand-to-hand drug transaction. At approximately 4:00 am, a light-colored sedan arrived and parked on the street near the **Target Premises #3**. An unknown black male exited the passenger side of the sedan and approached the east side of **Target Premises #3**, carrying a bag. The unknown male set the bag down on the steps before knocking on the same first-floor window of the **Target Premises #3**. The induvial from inside the **Target Premises #3**

20

closed the door, leaving the man with the bag on the front steps. About one (1) minute later, the same male from inside the **Target Premises #3** came to the door again and appeared to exchange something with the male on the steps. The individual went back into the **Target Premises #3** as the individual with the bag walked south on Bishop L. Scott Avenue, towards the white sedan, before departing the area.

56.    Based on prior training an experience of your affiant, and other members of the investigation, the unusual manner in which the individual with the bag was dropped off outside **Target Premises #3**, at the time of day they were there (4:00 am), coupled with them knocking on the same, first floor window used by other individuals in suspected hand-to-hand transactions, coupled with the short duration of contact between the individual with the bag with the occupant from **Target Premises #3,** who walked out of the same door used by **CULTON** during controlled drug purchase #3 and #4, further show **Target Premises #3** is being used to store and distribute narcotics.

### J.  Week of August 24, 2025 – Controlled Purchase #5

57.    During the week of August 24, 2025, members of the investigative team  utilized the CI to conduct another controlled purchase of fentanyl from **CULTON**.

58.    On August 25, 2025, PLW data identified the **CULTON cellular telephone** to be in the immediate vicinity of Page Avenue and Ferguson Avenue, St. Louis. Surveillance was conducted at the time, and investigators observed the Nissan Pathfinder, with Missouri plate CA8S6Y, parked in front the **Target Premises #4.** [12] Surveillance also observed **CULTON**, and

---

[12] St. Louis County records identified **Target Premises #4** to be owned by Janice THOMPSON, who is the mother of Charleston THOMPSON, aka "LIL' C". Charleston THOMPSON is currently under federal indictment, pursuant to drug trafficking charges, in the U.S. District

his brother Corey **CULTON**, standing on the front porch of **Target Premises #4**. An unoccupied black Mercedes-Benz, with Missouri plate RC7D38[13], was parked on the street behind the Nissan.

59.     Prior to the operation taking place, PLW data identified the **CULTON cellular telephone** to be in the immediate vicinity of Target Premises #4. Surveillance was established outside **Target Premises #4**. The same, previously identified gray Nissan Pathfinder, and the same, black Mercedes-Benz, with Missouri plate RC7D38, both unoccupied, were parked on the street in front of **Target Premises #4**. Corey CULTON exited **Target Premises #4** and departed in the black Mercedes. Investigators met the CI, and the CI contacted **CULTON** at the **CULTON cellular telephone**. The CI informed **CULTON** he/she was ready to meet whenever the **CULTON** was ready. **CULTON** said he will call the CI back soon. Several minutes later, the CI contacted **CULTON** at the **CULTON cellular telephone** and asked if **CULTON** was ready to meet. **CULTON** affirmed he was ready and directed the CI to the area of Page Avenue and Ferguson Avenue, in St. Louis.

60.     Investigators observed **CULTON** exit **Target Premises #4. CULTON** appeared to be holding his right pants pocket as he walked from the **Target Premises #4** to the Pathfinder. The way **CULTON** held his pants pocket in an unusual manner. **CULTON** appeared to be holding his pocket in a manner consistent with keeping a large item from falling out of his pocket.

---

Court for the Eastern District of Missouri (4:24cr29). Investigators are aware that **CULTON'S cellular telephone** was in phone contact with Charleston THOMPSON, prior to his arrest on federal charges, around February 2025.

[13] During surveillance conducted on August 26, 2025, at **Target Premises #1,** investigators observed a Mercedes-Benz sedan, believed to be driven by Corey CULTON, as it arrived at **Target Premises #1. CULTON** entered **Target Premises #1,** before exiting just a few minutes later and greeting Corey CULTON. Both drivers then switched vehicles and departed the area, with **CULTON** departing in the Mercedes and Corey CULTON departing in the Nissan.

61.    **CULTON** departed **Target Premises #4** in the Pathfinder. The CI was outfitted with approximately $6,500 in buy money and was outfitted with an audio transmitter and recorder to allow investigators to hear and record the anticipated controlled purchase. **CULTON** arrived at the deal location in the Pathfinder. The CI arrived at the deal location dictated by **CULTON**. The CI got into CULTON'S vehicle. The CI provided cash to **CULTON** in exchange for a white chunky substance, later confirmed to be fentanyl. Investigators confirmed with the CS that the person they conducted the hand-to-hand transaction with was in fact **CULTON**. This was corroborated by investigators after reviewing the audio/video recording which captured the transaction.

62.    Ping and cell tower location data from the PLW was consistent with the location and timeframe that surveillance observed **CULTON**, as he traveled from the **Target Premises #4** to the meet location, indicating **CULTON** was in possession of his phone both inside the **Target Premises #4** and as he traveled to the meet location for the narcotics transaction.

63.    Laboratory analysis of the substance is pending[14]. The substance had an approximate weight of approximately 240 grams.

### L.  Week of September 7, 2025 – Controlled Purchase #6

64.    During the week of September 7, 2025, members of the investigative team

---

[14] The drug evidence for this controlled purchase has been sent for chemical testing to the St. Louis Metropolitan Police Department Crime Lab and the results remain pending.

However, due to my training and experience, and that of the investigative team, I still believe the evidence to be fentanyl. Specifically, the appearance and consistency of the evidence (a white chalk or powder) indicates to me that it contains fentanyl, as well as the price **CULTON** is charging, the relatively high quantities being sold (multi-ounce level), and the surreptitious circumstances of the sales. Furthermore, **CULTON** is known to your affiant and other members of the investigative team as a fentanyl dealer within the St. Louis area.

utilized the CI to conduct another controlled purchase of fentanyl from **CULTON**.

65.     Prior to the operation taking place, the PLW data identified **CULTON'S** cell phone location to be in the immediate vicinity of the **Target Premises #4**. Surveillance was established outside **Target Premises #4**. A black Chevrolet Silverado with Illinois plate KR0G2L[15], which was unoccupied, was parked on the street in front of **Target Premises #4**.   Investigators met the CI, and the CI contacted **CULTON** at (314) 629-8119 (the same number the CI contact during controlled purchase #3). The CI informed **CULTON** he/she was ready to meet whenever the **CULTON** was ready. **CULTON** said he was ready and directed the CI to meet him near Page Avenue and Sutter Avenue, in St. Louis.

66.     The CI was outfitted with approximately $6,500 in buy money and was outfitted with an audio transmitter and recorder to allow investigators to hear and record the anticipated controlled purchase. The CI departed the staging location and arrived at the deal location. Investigators observed **CULTON** exit the **Target Premises #4** and got into the driver's seat of the Silverado. The Silverado departed the area, being followed by surveillance. **CULTON** arrived at the meeting location. The CI got into **CULTON'S** vehicle and exchanged the cash for a chalky, white substance. The CI provided cash to **CULTON** in exchange for a white chunky substance, later confirmed to be fentanyl. Investigators confirmed with the CS that the person they conducted the hand-to-hand transaction with was in fact **CULTON**. This was corroborated by investigators after reviewing the audio/video recording which captured the transaction. **CULTON** departed the area and went **CULTON** back to the **Target Premises #4**. **CULTON** got out of the Silverado and used a key to unlock the front door of the **Target Premises #4**, before walking inside. Ping and

---

[15] Law enforcement records checks returned no record on file for license plate KR0G2L.

cell tower location data from the PLW was consistent with the location and timeframe that surveillance observed **CULTON**, as he traveled from the **Target Premises #4** to the meet location, then back to **Target Premises #4**, indicating **CULTON** was in possession of his phone both inside **Target Premises #4** and as he traveled to and from the meet location for the narcotics transaction.

67.     Based on the surveillance team observing **CULTON** leaving **Target Premises #4** immediately prior to the controlled purchase, investigators believe that **CULTON** obtained the narcotics from **Target Premises #4** before going to distribute them to the CI.  Investigators believe that **CULTON'S** immediate return to **Target Premises #4** immediately following the transaction, reveals **CULTON** likely brought the proceeds from the drug transaction into **Target Premises #4.** Your affiant is aware that individuals engaged in drug trafficking activity often store bulk narcotics in their residence, and stash houses, and do not travel with all of their supply to individual drug transactions.

68.     Laboratory analysis of the substance is pending[16]. The substance had an approximate weight of 222 grams.

\* \* \*

69.     Based on the above information, your affiant submits that there is probable cause to believe that the **Target Premises #1,** the **Target Premises #2** the **Target Premises #3**, and the

---

[16] The drug evidence for this controlled purchase has been sent for chemical testing to the St. Louis Metropolitan Police Department Crime Lab and the results remain pending. However, due to my training and experience, and that of the investigative team, I still believe the evidence to be fentanyl. Specifically, the appearance and consistency of the evidence (a white chalk or powder) indicates to me that it contains fentanyl, as well as the price **CULTON** is charging, the relatively high quantities being sold (multi-ounce level), and the surreptitious circumstances of the sales. Furthermore, **CULTON** is known to your affiant and other members of the investigative team as a fentanyl dealer within the St. Louis.

25

**Target Premises #4** are currently being used in connection with the commission of the subject offenses, by **CULTON** and others known and unknown.  There is also probable cause to believe that the location information described in Attachment E to the requested warrant and order will lead to evidence of the subject offenses as well as to the identification of other locations that are being utilized in the commission of those criminal offense and related crimes.

70.     Indeed, as part of my experience and training and that of other law enforcement officers participating in the investigation, we have accumulated information and training in the areas of narcotics based economic crime.  I have had extensive experience, as have other members of the investigating team, in interviewing defendants, witnesses, informants and others who have experience in the gathering, spending, converting, transporting, distributing and concealing of proceeds of narcotics trafficking.  Based upon my and the investigating team's experience and our participation in other pending and completed controlled substances and/or financial investigations involving ongoing, extensive narcotics distribution conspiracies involving large amounts of controlled substances and money, I know the following:

a.     It is common for drug dealers to conceal contraband, proceeds of drug sales, and records of drug transactions in their residence or other buildings under their control.

b.     Drug traffickers frequently keep near at hand, in their residence or other buildings under their control, paraphernalia for packaging, cutting, weighing, and distributing of controlled substances. These paraphernalia include, but are not limited to scales, plastic bags, and cutting agents.

c.     Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, computer hard drives and disk records, money orders and other papers relating to the transportation, ordering, sale, and distribution of controlled substances.   Drug traffickers

26

commonly "front" (provide on consignment) controlled substances to their clients. The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them, specifically in their residence or in other buildings under their control.

d.      Drug traffickers commonly maintain telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of email and/or chatroom communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association in fact with  persons known to traffic in controlled substances or to facilitate such trafficking.  These records are maintained where drug traffickers have ready access to them, specifically, in their residence or in other buildings under their control.

e.      Drug traffickers take or cause to be taken photographs of them, their associates, their property, cash and currency, firearms, and controlled substances.  These traffickers frequently maintain these photographs in their residence or other buildings under their control.

f.      Persons involved in large-scale drug trafficking conceal in their residence or other buildings under their control large amounts of currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds, and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances.

g.      When drug traffickers amass large proceeds from the sale of controlled substances, they attempt to legitimize these profits.  I know that to accomplish these goals, drug traffickers utilize financial institutions, including but not limited to, foreign and domestic banks and their

27

attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts.  They maintain record of these transactions in their residence or other buildings under their control.

h.       It is common for drug traffickers to travel to major distribution centers, such as Texas, California, and/or Mexico to purchase controlled substances and/or to arrange for its distribution elsewhere in the United States. After purchasing controlled substances, these drug traffickers will transport or cause to be transported, controlled substances to the areas in which they will distribute the controlled substances.  The methods of transportation include, but are not limited to, commercial airlines, private airlines, rental automobiles, private automobiles, and government and contract mail carriers.  Records of travel are frequently kept in their residence or other buildings under their control.

i.       Evidence of occupancy and residence including, but not limited to utility and telephone bills, canceled envelopes, rental or lease agreements, and keys, is relevant evidence in controlled substances prosecutions.

j.       Drug traffickers frequently possess firearms and/or other weapons in their residence or other buildings under their control to protect their controlled substances and/or United States currency.

**CONCLUSION**

71.       Based on the foregoing I submit that this affidavit supports probable cause for warrants to search the **Target Premises #1** described in Attachment A, **Target Premises #2** described in Attachment B, **Target Premises #3** described in Attachment C, and **Target Premises #4**, described in Attachment D, and seize the items described in Attachment E.

72.       I further request that the Court order that all papers in support of this application,

28

including the affidavit and warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

I state under the penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

William A. Meyers
Special Agent
Federal Bureau of Investigation

Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on this _23rd_ day of September, 2025.

HON. NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE

29

## ATTACHMENT B – TARGET PREMISES #2
4:25 MJ 3285 NCC
*Property to be searched*

The residence, known and numbered **4038 SULLIVAN AVENUE, 1ˢᵗ FLOOR, ST. LOUIS AVENUE, ST. LOUIS, MO 63107,** hereinafter referred to as **Target Premises #2**. **Target Premises #2** is a two-unit, residential apartment building comprised of a brown brick exterior and white window frames. The covered front porch with concrete steps, leads up to the front doors for the separate apartment units. The front door to **Target Premises #2** is the left door, when facing the front of **Target Premises #2** from Sullivan Avenue. The right door is for a separate unit that leads upstairs. The right door does not lead to **Target Premises #2**. The front of the apartment building faces Sullivan Avenue. **Target Premises #2** is situated on the south side of Sullivan Avenue, three (3) houses east of Clay Avenue. **Target Premises #2** is in St. Louis, Missouri, within the Eastern District of Missouri. Investigators are requesting the search warrant for the first-floor apartment unit only and not the second floor unit.



**ATTACHMENT E**

4:25 MJ 3285 NCC
*Property to be seized*

1. All records and information that constitute contraband, fruits, evidence and instrumentalities concerning violations of Title 21, United States Code, Sections 841(a)(1) and 846, involving Charles **CULTON**, including:

 a. Controlled substances;

 b. Paraphernalia for packaging, cutting, weighing, and distributing controlled substances, including, but not limited to, scales, baggies, and spoons;

 c. Books, records, receipts, notes, ledgers, computer hard-drives and disk records, and other papers relating to the transportation, ordering, purchasing, and distribution of controlled substances and/or firearms;

 d. Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks, or receipts for telephone purchase/service;

 e. Cellular telephones, digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room and/or digital communication; answering machines; address and/or telephone books and papers reflecting (1) names, addresses, and/or telephone numbers of sources of supply and/or of customers, and/or (2) evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;

 f. Photographs, in particular photographs of co-conspirators, assets, and/or controlled

2

substances;

g.  United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds, and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances;

h.  Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks, and other items evidencing (1) the obtaining, secreting, transfer, and/or concealment of assets and/or (2) the obtaining, secreting, transfer, concealment, and/or expenditure of money;

i.  Papers, tickets, notes, schedules, receipts, and other items relating to travel, including, but not limited to, travel to and from the Eastern District of Missouri and elsewhere;

j.  Indicia of occupancy, residency, rental, and/or ownership of the premises described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements, and keys;

k.  Firearms and/or weapons.

3